**HOWELL v. DEADY et al.**

No. E—9641.

District Court, D. Oregon.

Nov. 17, 1941.

Maguire, Shields & Morrison and Donald K. Grant, all of Portland, Or., for plaintiff.

Edgar Freed and Nicholas Jaureguy, both of Portland, Or., for defendants.

JAMES ALGER FEE, District Judge.

This case involves the construction of the will of Lucy A. H. Deady. The court, on motion to dismiss, 48 F.Supp. 104, interpreted the language of the will itself and sustained the complaint. Thereafter, answer was filed. A pre-trial conference was held. Based upon a pre-trial order, the case was tried before the court. Since numerous objections were made to the evidence, the court has heretofore issued an opinion dealing with questions of admissibility, 48 F.Supp. 116.

The facts are as follows:

At the time of the execution of her last will,[1] Lucy A. H. Deady was 86 years of age, and at the date of her death, August 29, 1923, her age was 89 years. At the time of the execution of her will, and also at the time of her death, she had one living child, Henderson Brooke Deady, and two deceased children, Paul R. Deady and Edward N. Deady; three daughters-in-law, Amalie B. Deady (then the wife of Henderson Brooke Deady), Marye Thompson Deady (widow of Paul R. Deady), and Mary E. Deady (widow of Edward N. Deady); two grandchildren, Matthew Edward Deady and Hanover Deady, children of Edward N. Deady. At the time of the execution of Lucy A. H. Deady's last will, Henderson Brooke Deady was 51 years of age, Matthew Edward Deady was 31 years of age, and Hanover Deady was 28 years of age. At that time Henderson was, and for a long time had been, living apart and separated from his wife, Amalie B. Deady.

At the time of her death Mrs. Deady was seized of the real property in question.

Letters testamentary were issued to Henderson and Joseph Simon, September 15, 1923. Controversy seems to have sprung up immediately, concerning the distribution of money and the ownership of the property, between Henderson and Hanover. Wilbur, the attorney for Hanover and Matthew Edward wrote a letter to Joseph Simon, October 25, 1923, setting up a claim that the grandsons would be entitled to the whole estate on Henderson's death, and Joseph Simon answered October 26, 1923. The stipulation settling a temporary schedule of disbursements was executed December 18, 1923. Marye Thompson Deady, thereafter, commenced suit September 3, 1924, claiming a portion of the real property, and as a result, apparently, a second stipulation was executed for temporary distribution in October, 1924. Thereafter, when considerable negotiation had been carried on between Henderson and Amalie B. Deady, a divorce suit was filed by the former and based upon a property settlement, dated September 14, 1925, decree entered therein. Marye Thompson Deady's suit was settled by the stipulation dated October 28, 1925, a document which clears the executors and created a trust for the life of Marye Thompson Deady. Upon the day after, October 29, 1925, Henderson executed an affidavit to the effect that at that time he had no children. A great deal of negotiation was then carried on by Henderson and Hanover in the effort by Henderson to get consent to the payment of his share of the income to Charlotte Howell if he should die before the expiration of the six months after the date of his divorce decree from Amalie. The refusal of Hanover caused a violent quarrel. Henderson then left Portland and did not return. Shortly thereafter he married Charlotte Howell Deady. In 1931 another stipulation was signed as to distribution of the income by the executors.

Henderson died May 28, 1933, leaving no issue him surviving. He left a will which made no specific mention of this property, but named Charlotte Howell Deady as residuary legatee and appointed her to his share of the income of his mother's estate, in accordance with the provisions of his mother's will. Henderson's will was probated July 18, 1933. The estate has not yet been closed. Hanover was immediately interested in obtaining a definite expres-

---

[1] The will is printed in full in the former opinion of the court on a motion to dismiss, filed November 6, 1939, 48 F. Supp. 104.

sion as to how much money Charlotte Howell Deady would be entitled to under the appointment of Henderson. The result of this was that a compromise agreement was sent to her by Mr. Wilbur, which she refused to sign. Another document of settlement, both as to title and the income, was forwarded to her by Hanover's attorneys. This she signed October 11, 1934. On its return Matthew Edward signed but subsequently Hanover refused to execute it.

Joseph Simon died February 14, 1935, and the First National Bank was appointed and qualified as executor February 27, 1935. Charlotte Howell Deady died July 12, 1935. Her will, probated July 22, 1935, makes no mention of this specific property, but designates Richard Howell, her son, as her residuary legatee. This estate is still unclosed.

The mortgage on the property in question was in the amount of $40,000 at Mrs. Lucy A. H. Deady's death, and has been extended several times, and, on July 6, 1935, was still unpaid in the sum of $29,000.

On March 6, 1935, the estate of Mrs. Lucy A. H. Deady was closed and the First National Bank discharged as executor. Since then the defendants have held the property and denied any claim of the plaintiff thereto.

The court by construction of the will itself, exclusive of other factors, found that the intention of Mrs. Deady was to give to Henderson a fee simple title to an undivided two-thirds interest in the real property in question, if Henderson survived her. This fee was encumbered with a restriction against alienation for twenty-five years and until the mortgage could be paid off and also, with the payment of certain definite sums to various persons.

The question of construction of the will by the parties involved is now raised upon the evidence.

Before discussing these issues, it should be noted that there appears inferentially in the record strong evidence of the correctness of the construction placed upon the will by the court.

Henderson, Paul R. and Edward N., sons of Judge and Mrs. Deady, by the will of their father, became at his death, jointly the owners in fee simple of the very real property here in issue, subject only to the life interest of Mrs. Deady. At her request, without consideration, the three sons deeded the fee of this property to her, in order that the building could be erected thereon. This is undenied. Paul R. died without children, Marye Thompson Deady was given a monthly payment under the will, as his widow. Mrs. Lucy A. H. Deady recognized the obligation to Edward N. by giving to his sons, Hanover and Matthew Edward, one-third of the real property in fee subject to the "conditions, provisions and charges". It does not seem consistent to believe that she did not give an unqualified fee when she devised the balance of the property to Henderson, subject to the same "conditions, provisions and charges".

As noted above, Henderson had already held part of the property in fee and had deeded it to her. Unquestionably, she recognized this strong obligation and returned to him the fee which he had deeded to her, together with the interest of his deceased brother, but burdened with the cash payments and the restriction on alienation. This evidence almost conclusively sustains the construction. Because the gift in fee was in satisfaction also of a debt, the court in Imbrie v. Hartrampf, 100 Or. 589, 597, 198 P. 521, 524, says: "while the amount of the indebtedness is not disclosed by the record, it would not seem that the father in the liberal disposition of his bounty to his son, as manifested by the will, would devise a title in fee to land for a consideration in one part of the will and take it away or diminish the title, debase the fee as it is usually termed, in another part." Like considerations compel a like conclusion in the instant case.

But it is contended that either agreements or utterances of the devisees throw light upon the construction of the will.

■ There are three foundations upon which the court may consider occurrences after the death of Lucy A. H. Deady. First, if the family in written documents settled the construction of the will or the clauses thereof or, second, if Henderson or Charlotte, as holder of the title in some binding manner placed limitation thereon, or, third, if either of them, when holding title, by false words or acts, misled Hanover and Matthew Edward to the point that it would be inequitable to allow a successor to set up the truth, then the construction of the will heretofore found by the court might be modified accordingly.

The court will consider as to the first ground four documents, signed by legatees

and devisees under the will of Lucy A. H. Deady. The second basis will require a consideration of certain documents executed by Henderson and Charlotte Howell Deady. The third ground will require a consideration of the question of whether either Henderson or Charlotte was under a duty to speak or make representations, and what representations either of them made, whether Hanover or Matthew Edward relied thereon and whether damage was caused thereby.

There are four transactions in which the parties interested were involved: (1) the stipulation of December, 1923, (2) the stipulation of October, 1924, (3) the stipulation based on the claims of Marye Thompson Deady, dated October, 1925, (4) the stipulation of August, 1931.

The first stipulation of December 18, 1923, states that there is a dispute "as to whether or not the estate of said deceased shall be distributed as by said will directed and as to the *ownership* of the real estate" in controversy here. This document was signed by all the interested parties. Hanover testified that the controversy then pending was the claim of Marye Thompson Deady to one third of the real property in question. But the suggestion as to a stipulation regarding distribution of the income came, on October 26, 1923, from Ralph W. Wilbur, one of the attorneys for Hanover, and in the same letter there is the claim that the grandsons would ultimately come into the title of the whole tract, but no mention of the Marye Thompson Deady claim. Mr. Joseph Simon, the co-executor, in answer to this letter on October 28, 1923, agreed to the stipulation to protect the executors, but answers the claim as to the ultimate title by a suggestion that "all parties interested get together and arrive at some adjustment of their differences and avoid irritation and ill feeling".

It is extremely significant that Mr. Wilbur did not mention the claim of Marye Thompson Deady and that the dispute as to title was then between Henderson and the grandsons. The inference to be drawn is that Henderson, to the knowledge of Hanover and Wilbur, was claiming the fee, but this point was expressly left in abeyance by the document.

The stipulation of October, 1924, carried on the same agreements, except that Henderson, by the terms thereof, received $100 per month additional. It is true this instrument bears evidence that Marye Thompson Deady was at that time urging her claim, for in order to get her signature Henderson was required to pay to her $10 per month out of the additional amount obtained by him. But, it will be noticed that her suit had been filed September 3, 1924, which is some indication that it was not being urged at the time of the first stipulation, executed almost a year before.

The primary purpose of the stipulation of October, 1924, was the settlement of the suit filed by Marye Thompson Deady on September 3, 1924. The salient feature of the stipulation is that it is not and does not purport to be a construction of the will as to the shares acquired by Henderson and the grandsons, but was a new agreement among all the devisees, in settlement of the claim made by Marye Thompson Deady that Lucy A. H. Deady had nothing but a life estate in the real property in question. However, the special warranty deed to be executed according to this stipulation is to be made by Marye Thompson Deady to Henderson and to each of the grandsons and not to trustees. This indicated that the title was in the devisees and not in trustees. Furthermore, the deeds are to be made "in proportion to their interests". If this is a construction of the will, the inference would be that Henderson was to get a deed to two-thirds and Matthew Edward and Hanover a deed to one-sixth each, respectively. If this is not the implication, then no claim can be based upon the stipulation except that the grandsons in the face of a dispute over the title did not have it explicitly settled. There is certainly no implication here that Henderson was yielding to their construction.

The remaining stipulation of August, 1931, refers to the stipulations of December, 1923, and October, 1924, and redistributes the income during the remainder of the ten year period set up in the will, but certainly has no implications as to construction of the will, or as to the disposition of the real property. It is notable that Marye Thompson Deady did not sign this stipulation, and that the agreement of October 18, 1925, is not mentioned therein.

■ If all of these "family" documents be considered, it is obvious that none had for its purpose the construction of the will. The initial letters indicate the grandsons were claiming the whole property on Henderson's death. Yet nowhere in the documents is this question settled, nor is it ever mentioned again. Henderson was able to

obtain the bulk of the income contrary to the terms of the will and defer the collection of a sinking fund contrary to the terms of the will, notwithstanding the claim advanced by Mr. Wilbur that the bulk of the income should be applied upon the mortgage sinking fund to protect the interest of the grandsons as ultimate devisees. Ably represented as the grandsons were, they would not have turned over the great bulk of the income to Henderson without a definite agreement that the grandsons would come into the property on Henderson's death. On the contrary, it is highly significant that the only document which directly deals with the title uses the phrase "in proportion to their respective interests."

The most that can be said of this situation is that there was a deliberate failure to interpret the will after a sharp conflict had originally been suggested and at a time when Hanover contends no one had suggested a contrary construction.

■ The second basis for construction of the will consists of the acts and declarations of Henderson and Charlotte. This subject is further divided into written documents and oral expressions.

The written documents executed by Henderson which have bearing are: (a) the settlement with Amalie, his first wife, (b) the affidavit to the effect that he had no children, (c) his will.

The first document for consideration is the property settlement between Henderson and his first wife, Amalie. This instrument contains only one expression which bears on the point. It is stipulated that Lucy A. H. Deady by will "did give, devise and bequeath to Henderson Brooke Deady the undivided two thirds of Lot numbered one * * * conditioned as in said will provided". It is possible that this expression might relate to the supposed executory devise. But it more probably relates to the words of the will that the devises of Lot 1 "are upon the express condition that said property shall not be disposed of or encumbered during the period" of twenty-five years. All parties unquestionably accepted the restriction on alienation as valid. Since Henderson could not convey or encumber his interest, the only way in which Amalie could get support was through the payment of money from Henderson directly while he lived, and by a share in the appointed annuity to his widow. In her situation, the

freeing of the fee from restrictions at the end of twenty-five years could be of small interest. There are no implications to be drawn from this instrument that Henderson did not have fee simple title, subject to the restriction of alienation.

The affidavit executed by Henderson states that "no child or childern have ever been born to me and that I have not had and have not now any issue by marriage or otherwise". This is a formal document filed in the estate. It was executed after the decree in the divorce case and after the final settlement with Marye Thompson Deady.

At that date if Henderson had died, Hanover and Matthew Edward would have been his heirs, if Henderson at the time of his death had no children, not by virtue of Mrs. Deady's will, but in accordance with the general laws of inheritance. He had no other relatives and he believed he could not alienate his interest. Henderson, further, was expectant of death within a short time. This appears as a sufficient and, in fact, the only possible explanation of the document. If the construction of the will had been in issue, the document would have expressed this purpose and have contained apt terms to settle the controversy.

The instrument was intended also to clear Charlotte of the charge made by Hanover and is unquestionably connected with the quarrel mentioned later. Considering the time of execution, it cannot have been intended to convey any implication that Henderson did not have fee simple title.

There is no doubt that Henderson, through loyalty to the wishes of his mother or through belief in the legality of the provisions, bound himself so far as he could to the validity of the distribution of the income by the executors in accordance with the stipulations and in view of the restriction on alienation. He acted as if he had a personal belief that these were binding.

This belief is of interest, in interpreting his own will, the last instrument for consideration on this subdivision. He did appoint an income to Charlotte, as his widow. He believed that with the distribution prescribed by the will or the various stipulations and the restraint on alienation he could not provide for her in any other way. Otherwise, he would not have been so violently disturbed over Hanover's refusal to provide for Charlotte before their marriage.

The failure to devise his interest in Lot 1 to Charlotte expressly in his will, probably has the same explanation. He would expect the others to take advantage of breach of the condition against alienation, especially if Charlotte were involved.

The written documents with which Charlotte was connected are next in order. These consist of: (a) the abortive stipulations and (b) her will.

(a) The first instrument relating to the interest of Charlotte was sent to her by Mr. Wilbur, the attorney for Hanover and Matthew Edward, after Henderson's death. There is dispute over the contents and it need not be further regarded.

The second was signed by Charlotte and Matthew Edward and by Mr. Wilbur, as witness, but not by Hanover and, therefore, did not become effective. This document can be construed in no other way than as a claim of a fee simple interest in the property on behalf of Charlotte with an offer to compromise for a life estate and an assured income. The "controversies" regarding "the nature and extent of their interests and estate in said real property" and the fact that "each has and does assert claims thereto adverse to the claims asserted by the other" are recited. Charlotte offers to deed to Hanover and Matthew Edward "all her right, title and interest in and to Lot numbered one" subject to the legacies "but there is saved, excepted and reserved to said Charlotte Howell Deady, for the term of her natural life, a life estate in an undivided two thirds interest in said real property and its appurtenances and in and to the rents, income and profits therefrom". The document contains also a confirmation of the life estate from the grandsons. This was clearly the assertion of a claim to the title in Charlotte. Equally clear is her acceptance of distribution by the executors according to the stipulations and her acceptance of the restriction on alienation.

(b) Her will must be interpreted like that of Henderson. Apparently she, like Henderson, believed that a devise of the interest expressly would be in violation of the condition against alienation.

A thorough consideration of the written documents executed by the parties indicates that all accepted the management of the real property, the distribution of income by the executors and the validity of the restriction on alienation. No express statement in any document is made construing the language of clause seven of the will, not-withstanding the grandsons now urge that Henderson continually adopted the construction for which they now contend.

Next, the testimony of oral expressions by Henderson and Charlotte should be considered. It is extremely doubtful whether this testimony was admissible. In almost every instance the oral testimony was introduced to explain or contradict expressions in the series of written documents which have been considered, including the will. If Henderson accepted the interpretation of clause seven of the will as an executory devise to the grandsons on his death without issue, it would seem that this vital factor would appear in the documents.

It has been urged that Joseph Simon, Chester V. Dolph and Lester W. Humphries and Mary E. Deady are dead and cannot testify as to the representations made by Henderson. But the fact which is more ponderable is that this testimony now under consideration consists of oral declarations claimed to have been made by Henderson, who is dead and cannot explain them.

Neither Henderson nor Charlotte were under any more duty to urge their interpretation of the will than were Hanover and Matthew Edward. Even if the latter were continually urging the proposition that Henderson did not have a fee simple, he and his successors would have a right to rely upon the terms of the will.

The danger and difficulty of re-interpreting written documents upon oral declarations made under various situations over a course of years is apparent.

However, several situations will be considered. The conversations with Weinstein over the settlement with Amalie are in explanation of a written document which is before the court and which does not by its language clearly convey an expression concerning the title. Clear and convincing proof of declarations which divest one of fee simple title must be required. If this was the key of the settlement it would logically appear in the document.

These declarations are furthermore related in general effect and not by specific conversation. How much of this understanding came by Weinstein's own interpretation, or by vague impressions of someone else who may have read the will and how much was directly said by Henderson himself is problematical. Henderson and his then wife were dealing at arm's length. Once she was divorced,

Hanover and Matthew Edward would be the heirs of Henderson, unless he already had children and it is probable that the declarations related to this situation, since Hanover made that the point of discussion two months later when the affidavit, which has already been discussed, was obtained. If the inalienability of the property for twenty-five years be assumed, as apparently Henderson assumed it, the settlement was fair and no further circumstantial guaranty of this fact is necessary. Charlotte, after her marriage to Henderson carried out these terms to the letter.

The salient point is that if such admissions were made none were reflected in the written property settlement between Henderson and Amalie.

The alleged declarations of Henderson to Hanover were spread over the period of time from the death of Lucy A. H. Deady on August 29, 1923, to the departure of Henderson for the East, sometime in November, 1925. So far as the testimony is specific as to the conversations, each occurred with reference to a situation which resulted in a document. The first was soon after Lucy A. H. Deady's death. These conversations could not have been as satisfactory to Hanover, since they were followed (1) by the letter of Mr. Wilbur of October 26, 1923, which criticizes the claims of Henderson and advances the interpretation of the will here urged by the grandsons, (2) by the letter of Joseph Simon of October 28, 1923, counselling an amicable arrangement, and (3) by the stipulation of December 18, 1923, which recites that there are controversies, and yields to Henderson a major portion of the income, contrary to the claim of the Wilbur letter that this should be applied to the sinking fund because the grandsons owned the ultimate title.

The declarations to Mary E. Deady are closely connected with the stipulation settling the Marye Thompson Deady claim and can be explained upon the basis that, at that time the grandsons would have got the title in the event of Henderson's death, if he had no children then. The similar explanation of the conversations relating to the affidavit has already been made.

The conversations and quarrel regarding the refusal of Hanover to provide for Charlotte in the event Henderson died before he married her, show Henderson's attitude toward the condition against alienation. He was in fear of immediate death, but he was also afraid to marry Charlotte before the six months had expired, because it might be claimed she was not legally his widow. If he was not married at the time of his death, Hanover and Matthew Edward would have inherited his two-thirds unless he had children. He had sworn he had no children, probably as a preface to an attempt to get Hanover to agree to provide for Charlotte, in the event he could not marry her before his death.

Charlotte has only one declaration reported and that by hearsay. It was to the effect that Charlotte "knew what Mrs. Deady wanted". These words may mean that Mrs. Deady wanted the estate kept intact and that Charlotte was not going to violate that wish herself. It certainly does not mean that she was advancing no claim to title, as the offer of settlement shows.

Summarizing, none of the written documents contain direct evidence that Henderson was not claiming a fee. The implications are all to the contrary. The oral declarations are vague and indirect and are generally in explanation or contradiction of one of the written documents. Finally, Henderson was under no more duty to place his claim of absolute title into the foreground than were Hanover and Matthew Edward to insist upon their interpretation.

Hanover, moreover, places no reliance upon anything Henderson said or did. The aura of conflict between the two is perfectly apparent in reading the record. Hanover's attitude has been one of hostility to Henderson on account of disapproval of the alleged conduct of the latter. This hostility is untempered by any modifying factors toward Charlotte and plaintiff. It is apparent in the first letter of Mr. Wilbur soon after Mrs. Deady's death, in the refusal to make a compromise regarding support for Charlotte if Henderson died before marriage, in the desire to cut her annuity as far as possible immediately after Henderson's death. Assuming entire honesty upon his part, it colors his testimony when he says that the stipulation of December 18, 1923, was based altogether upon the controversy relating to the interest of Marye Thompson Deady, when the previous correspondence shows that there was a clash

of interest regarding the title between Henderson and himself. This led him also to deny that Charlotte made any claim to title when the document which was before him set up claim of title in her. If this stubborn and uncompromising moral attitude had not existed, he could have settled this dispute by a stroke of the pen. Mr. Wilbur could not have taken the same attitude, since he allowed Matthew Edward to sign the stipulation, put his own name to the document as a witness and thereafter held the document for months, in apparent hope that Hanover would sign it.

This same spirit apparently led Hanover to convince himself that Henderson and everyone else agreed with him on his peculiar interpretation of the will. It is credible that he has constantly believed that the title would come to him if Henderson had no children. But this may be because he would believe no one who suggested a contrary interpretation or doubts as to the construction. In any event, there were many controversies over the income and he did not require Henderson in any stipulation to specifically state that Hanover and Matthew Edward were to receive the two-thirds of Lot 1 on the former's death, notwithstanding that he yielded to the demands of Henderson for more income many times through the years.

■ Thus, none of the alleged constructions of the will have weight with the court. The court finds that two-thirds of Lot 1, Block 212, vested in Henderson at the death of his mother, passed to Charlotte and from her to plaintiff.

■ The next question is as to what relief plaintiff is presently entitled.

The court has heretofore construed the will and thereby found that there was no real testamentary trust since the fee title was vested in the grandsons and Henderson. The executors were simply given the right to collect and distribute the income, pay the specific legacies and create a sinking fund. The power to renew the mortgage is given to the fee owners and the restriction against alienation is placed directly against them, not against the executors.

The question of subsequent construction does affect this clause of the will. Joseph Simon and Henderson did not close the estate and claimed only to act as "executors". Joseph Simon did not close the estate after Henderson's death nor during the remaining period of his own life and claimed to be acting as surviving executor. In each of the stipulations Joseph Simon and Henderson are described as "executors". They never pretend to act as trustees. In each stipulation a complete validation of the previous acts and payments made by the "executors" is required. These circumstances clearly indicate a serious doubt as to the validity of the clauses of the will, which it now is contended create a trust.

When the First National Bank closed the estate as executors, it was not, therefore, vested with any rights as a trustee, under the will or otherwise. The land was charged with the payment of specific sums of money and these would have to be paid by the holders of the fee, insofar as valid.

■ There was, however, a trust created by the stipulation of October 28, 1925, Joseph Simon and Henderson received the real property during the life of Marye Thompson Deady with the duty to pay the specified sums and to create a sinking fund. Since plaintiff is not therein mentioned he cannot be considered as entitled to share in any present income from the property. However, he is presently entitled to an accounting from the trustee who may be appointed to succeed the original trustee under this stipulation. The First National Bank is not a successor, but wrongfully exercises control over the estate. But by virtue of its possession, it holds the property subject to the obligations of a trustee by virtue of its own wrongful seizure. Plaintiff is then entitled to an accounting as against the bank.

Findings and judgment will enter in accordance with this opinion.